1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

12

13

14

15

16

| | |
|---|---|
| AEROJET ROCKETDYNE, INC., | Case No. 2:17-cv-01515-KJM-AC |
| Plaintiff, | |
| v. | ORDER |
| GLOBAL AEROSPACE, INC., et al., | |
| Defendants. | |

17

18

19

20

21

22

23

24

      This is an insurance recovery and bad faith suit arising from (1) a May 22, 2014 failure of plaintiff and counter-defendant Aerojet Rocketdyne, Inc.'s engine during a hot-fire test and (2) an October 20, 2014 failure of an Aerojet engine during the launch of an Antares rocket headed for the International Space Station. Aerojet paid non-party Orbital $30.5 million to settle claims arising from both accidents. Global Aerospace Inc. and its pool members and co-insurers,[1] defendants and counter-plaintiffs, denied Aerojet's claim for the settlement and defense costs, finding the claim was not covered under Aerojet's policy with Global. Aerojet now moves for

25

26

27

28

---

[1] *See* ECF No. 154 ¶¶ 106−132 (describing each defendant and counterclaimant). For purposes of this order, the court refers to all defendants except defendant Mitsui Sumitomo Insurance Co. of America using the nomenclature "Global." Global, and not Mitsui, filed the counterclaims at issue here. Although the court uses the third person singular in referring to "Global," it acknowledges that "Global" refers to multiple parties. When the court refers to "defendants," it refers to all defendants, including Mitsui.

summary judgment on Global's counterclaims and also moves to strike Global's answer and counterclaims. As explained below, the court GRANTS the motions in part and DENIES them in part.

I.     BACKGROUND

Unless otherwise indicated, the following facts are undisputed. *See* ECF No. 126-1 (Global's responses to Aerojet's statement of undisputed facts).

A.     Aerojet's Insurance Policies with Defendants

From June 1, 2013 through June 1, 2014, Aerojet was insured under a Comprehensive Aerospace Liability Insurance Policy, number 341262/13, issued by defendants, which provided a $2 billion coverage limit. UMF 6−7. Aerojet paid $1,275,000 in premiums for this policy. UMF 47. From June 1, 2014 through June 1, 2016, Aerojet was insured under a Comprehensive Aerospace Liability Insurance Policy, number 311262/14, also issued by defendants and also providing $2 billion in coverage limit. UMF 6−7. Aerojet paid $1,147,500 in premiums for this policy. UMF 47.

B.     The Aerojet-Orbital Contract, May 22, 2014 E-17 and October 28, 2014 Orb-3 Explosions and Settlement

In 2009, Aerojet and Orbital Sciences Corporation entered into a contract under which Aerojet would supply Orbital with Aerojet's AJ-26 rocket engines for the first stage of Orbital's Antares launch vehicle. UMF 1. On May 22, 2014, one of Orbital's AJ-26 rocket engines supplied by Aerojet, designated E-17, exploded during a hot-fire test at NASA's Stennis Space Center ("the E-17 accident"). UMF 2. The E-17 explosion caused significant damage to the test facility and ground equipment. UMF 3; *see* Resp.[2] (arguing this damage "was fully insured under Orbital's first-party insurance coverage"). After the E-17 accident, Orbital notified Aerojet that Orbital intended to sue. UMF 8. On July 18, 2014, Orbital sent Aerojet a draft complaint, which included allegations regarding the E-17 accident but primarily alleged "Orbital-Aerojet Contract

---

[2] In citing to "Resp.," the court refers to Global's response to Aerojet's material fact, as provided in ECF No. 126-1. The court specifically notes which material fact Global responded to only when multiple facts are cited and the court intends to cite Global's response to some, but not all, of those facts.

2

failures." UMF 9−10; *see* Resp. to UMF 10 (noting 2014 draft complaint contains other allegations and claims).  Because Aerojet and Orbital entered into a tolling agreement, Orbital did not file its complaint.  UMF 9.  Instead, Aerojet and Orbital spent several months negotiating a potential settlement of all claims Orbital raised in its 2014 draft complaint and, on October 2014, reached an agreement ("the handshake agreement").  UMF 11; *see* Resp. (noting Aerojet has designated evidence of handshake agreement as Rule 408 submissions; citing proposed Aerojet-Orbital settlement language that would reserve an issue of past contract overpayments to be separately resolved).  Under the handshake agreement, Aerojet would pay Orbital approximately $15.5 million to resolve the parties' contract disputes and $1,557,500 for damages caused by the E-17 accident for a total settlement amount of approximately $17 million.  UMF 12; Resp. (arguing additional discovery is necessary to respond and objecting to Aerojet's use of its "'valuation' of the tentative settlement agreement" as fact).

On October 28, 2014, before Aerojet and Orbital executed their handshake agreement, another Aerojet AJ-26 rocket engine supplied by Aerojet to Orbital to power an Orbital Antares launch vehicle exploded shortly after ignition ("the Orb-3 Accident").  UMF 4, 13.  This explosion destroyed the launch vehicle and its cargo, which was intended for the International Space Station, and significantly damaged the launch pad and associated facilities and buildings, delaying future Orbital launches.  UMF 4−5.

After the Orb-3 Accident, Orbital formed an independent review team with representatives from Orbital, Aerojet and NASA to investigate the cause of the Orb-3 Accident.  UMF 14.  Aerojet conducted an independent investigation and shared its conclusions with Orbital and NASA.  UMF 15.  The independent review team concluded Aerojet was responsible for the Orb-3 Accident.  UMF 16.  NASA, which also conducted an independent investigation, UMF 15, concluded there were three root causes and Aerojet was responsible for two of those root causes, UMF 16; *see* Resp. (noting NASA found Orbital responsible for third cause).   In its own investigation, Aerojet concluded Orbital was responsible for the accident.  UMF 16.

On August 19, 2015, Orbital sent Aerojet an email explaining its investigation indicated Aerojet was at fault for the Orb-3 explosion, owing to a defect in Aerojet's engine, and

providing a draft notice of termination for default. UMF 17. Orbital's email included a new draft complaint ("2015 draft complaint") and informed Aerojet that Orbital had now incurred $300 million in damages. UMF 17; 2015 Draft Compl., Wong Decl.[3] Ex. 2. Orbital offered to settle for $85 million, conditioned on Aerojet's paying the settlement amount demanded no later than August 21, 2015. UMF 18. On August 21, 2015, two days after Orbital sent its email and the date of Orbital's deadline for payment, Aerojet's insurance broker emailed Global a notice of Orbital's demand, providing a copy of Orbital's 2015 draft complaint. UMF 19; Resp. In its email, Aerojet's broker advised Global that Aerojet wanted to enter into a settlement agreement with Orbital and requested Global's immediate engagement. UMF 19. On August 24, 2015, Aerojet informed Global that Orbital had extended its settlement deadline to the next day, August 25, 2015. UMF 20; Wong Decl. Ex. 3. Aerojet again explained it wished to settle and asked Global to "work with Aerojet on an expedited basis to respond to [Orbital's] demand in order to settle the dispute." UMF 20.

On September 1, 2015, Global Aerospace, Inc. sent Aerojet a non-waiver agreement signed by Global Aerospace, Inc. on behalf of all defendants. UMF 21; Non-Waiver Agreement, Wong Decl. Ex. 4. Under the non-waiver agreement, the parties "agree[d], on an expedited basis, to an arrangement under which "Aerojet may enter into a settlement with Orbital . . . in order to avoid threatened litigation," but because time constraints "and the lack of sufficient information ma[de] it impossible for Global to evaluate the claim adequately or to determine whether the Policies provides [sic] Aerojet with coverage for any of the damages sought by Orbital," the parties also agreed:

> 1) That Global reserves its right to deny coverage with regard to some or all of the Orbital claim and specifically reserves its right to issue a separate reservation of rights when further information is made available and sufficient time is given to conduct a thorough review.
>
> 2) That Global agrees to waive any objection it may otherwise have had pursuant to Policy Considerations 5(d) or 5(c)(3)[4] to any

---

[3] Wong's declaration is provided at ECF No. 110-5 and exhibits to that declaration are provided at ECF Nos. 110-6 to 110-11.

[4] Section IV(5) of the 2014 policy governs "Duties in the event of Occurrence, Loss, Claim or

4

settlement Aerojet may enter into with Orbital in connection with the Orbital claim prior to the commencement of litigation only, without waiving any other rights, including the right to disclaim coverage. This limited waiver is provided in order to afford Aerojet the opportunity to avoid litigation by negotiating a settlement which Aerojet believes to be in its best interest.

3) That Global expressly reserves its right to challenge the reasonableness of any settlement Aerojet may enter into with Orbital and this waiver is not a commitment on the part of Global to pay any part of such settlement.

4) That Aerojet agrees that it will keep Global abreast of its settlement negotiations with Orbital and will not purport to reallocate or recharacterize any item of damages that may become the subject of a settlement agreement and release exchanged with Orbital.

5) That Aerojet further agrees to provide Global with additional documentation in connection with the Orbital claim as required by Global to conduct a full investigation of the claim under the Policies.

Non-Waiver Agreement at 1−2; UMF 22−23.

On September 21, 2015, Aerojet and Orbital executed a settlement agreement under which Aerojet agreed to pay Orbital $50 million. UMF 24; Settlement Agreement, Wong Decl. Ex. 5. Aerojet contends its $50 million settlement payment was a lump sum cash payment and the agreement did not allocate the settlement amount. UMF 25. Global argues "[t]he [s]ettlement [a]greement describes what disputes were being settled," though they do not identify any portion of that settlement agreement describing such disputes. *See* Resp. to UMF 25 (citing Settlement Agreement generally).

C.  Aerojet's Initial Reimbursement Request to Global, Global's Initial Denial and Subsequent Denials of Aerojet's Reconsideration Requests

On February 17, 2016, Aerojet sent Global a letter with "its request for reimbursement of payments made by [Aerojet] for covered damages arising from the claims asserted by Orbital," stating Aerojet "currently submits a request for an initial reimbursement

_____

Suit." 2014 Policy, Def. Ex. F at 29. Section IV(5)(d) provides, "No insured will, except at their own cost, make any payment, assume any obligation, or incur any expense, other than for first aid, without our consent." *Id.* Under § IV(5)(c)(3), "The [Aerojet] Executive Director, Risk Management or his or her designee must: . . . Cooperate with us in the investigation, settlement or defense of the claim or *suit* . . . ." *Id.* (original emphasis).

payment from Global in the amount of $9,654,490.24." Initial Request, Wong Decl. Ex. 6, at 1, 2; *see* UMF 26, 28; Resp to UMF 26. This amount included, as relevant here:

> A) Costs for repairs to property resulting from the E-17 Incident per Orbital letter dated December 21, 2015 and attachments: $2,000,000
>
> B) Property damage arising from Orb-3 Incident to date per Orbital letter dated November 6, 2015 and attachments: $4,997,415.54
>
> C) Attorney's fees incurred by AR to defend Orbital's claims: $1,682,773.45 . . .
>
> D) Electronic discovery document and data management services . . . $994,301.25 . . . .

Initial Request at 2−3. Aerojet also stated, "this initial request for reimbursement does not include all property damage incurred by Orbital as a result of the [E-17 and Orb-3] incidents." *Id.* at 3; UMF 27 & Resp.

The parties dispute whether Aerojet limited its February 17, 2016 request for reimbursement to property damage claims. UMF 27−28, 30; Resp. to UMF 27. Citing the Orbital-Aerojet settlement agreement, Aerojet notes Orbital's claims "were far broader than just 'property damage' and included damages such as delay and disruption damages . . . ." *See* UMF 29 (citing 2015 Draft Compl. at 28, 34, 44−45 & Initial Request at 2); Resp. (disputing UMF 29 on basis "[t]he [Initial Request] letter speaks for itself"). Global argues the letter repeatedly refers to "property damage" but "[a]t no point . . . mention[s] any type of damage other than property damage for which Aerojet was seeking or intended to seek reimbursement." Global Resp. to UMF 27 (citing Initial Request at 2). The parties agree this initial request did not include all property damage and did not include damages such as delay and disruption damages. UMF 31.

On October 4, 2016, defendants denied Aerojet's claim in full in a fifteen-page letter, finding "no coverage for the claim under Aerojet's Policies." UMF 32; *see* Initial Denial, Wong Decl. Ex. 7. Global principally denied the claim because, in its assessment, Aerojet and Orbital's cross-waivers and waivers of consequential damages and Orbital's other contractual waivers precluded Orbital from holding Aerojet liable for damages. UMF 33−34; *see* Initial Denial at 10−13. Global did not state it lacked information necessary to make a coverage determination. UMF 35−35.

On November 15, 2016, in a seven-page letter, Aerojet raised several disagreements with Global's assessment of its claim and requested Global reconsider the denial. UMF 36−37; Wong Decl. Ex. 8 at 1 ("Global concedes that the Policy covers the claimed property damage. Even so, it uses [Aerojet's] successful settlement of Orbital's disputed claims to speculate what defenses [Aerojet] might have raised . . . . then assumes that AR would have escaped all liability for the claimed property damage."); *id.* at 7 (arguing settlement benefitted Global, which "would have had a duty to defend [Aerojet] against all claims alleged in the draft complaint" had Orbital filed suit rather than settling with Aerojet).

Global responded in an eight-page letter on February 16, 2017, denying Aerojet's contentions and concluding "[t]he absence of any additional facts in [Aerojet's] [r]esponse provides no basis for altering the conclusion that the Policies do not cover any part of Orbital's claim against Aerojet." UMF 38; Wong Decl. Ex. 9 at 8.

On April 12, 2017, Aerojet sent Global a fifteen-page letter, again disputing the denial and identifying "new factual information and legal analysis of the key issues for [Global's] consideration." UMF 29; Wong Decl. Ex. 10 at 1. This letter stated, "Although Aerojet understood the majority of the claimed damages were for claims other than specific property damage, Aerojet will be able to establish it paid approximately $10 million of the $50 million to settle property damage claims and . . . there may be additional covered damages that are 'because of' property damage." *See* UMF 40−41; Wong Decl. Ex. 10 at 1. Aerojet claimed "because of" property damages covered under the policy would include, for example, "delay damages." UMF 41; Wong Decl. Ex. 10 at 8−10 & n.3. Aerojet also included its expert's draft report assessing the waivers Global relied on in its denial. UMF 41; Wong Decl. Ex. 10 at 17−23; *see also id.* at 14 (Aerojet letter arguing "[t]he cross-waivers upon which Global relies to deny coverage are poorly drafted . . . , do not comply with the [Commercial Space Launch Act][5] and contain fatal ambiguities").

---

[5] Although the parties' briefs do not discuss the Commercial Space Launch Act in any detail, it appears that act appears at 51 U.S.C. § 50901, *et seq.*, with the relevant cross-waivers provision provided at 51 U.S.C. § 50914(b) ("A launch or reentry license issued or transferred under this chapter shall contain a provision requiring the licensee or transferee to make a reciprocal waiver of claims with applicable parties involved in launch services or reentry services under which each party to the waiver agrees to be responsible for personal injury to, death of, or property damage or

On April 26, 2017, in a one paragraph email, Global explained "nothing in [Aerojet's] April 12 letter or its attachment provides a basis for altering our conclusion that there is no coverage for any part of the above-referenced claim." UMF 42; Wong Decl. Ex. 11.

On June 26, 2017, Aerojet filed this action in state court and defendants then removed the case to this court. UMF 43; *see* Notice of Removal, ECF No. 1; Compl., ECF No. 1-1. Aerojet's complaint did not limit its damages request to property damages; its disclosures made subject to Federal Rule of Civil Procedure 26 stated Aerojet "seeks coverage for all damages covered by the policies issued by defendants up to $50 million settlement amount." UMF 44−45. Aerojet's August 3, 2018 third supplemental disclosures stated, "Aerojet seeks indemnification for all damages covered by the liability policies issued by defendants up to approximately $29 million for Orb-3 damages and approximately $1,557,500 for E-17 damages." UMF 46; *see* Resp. (Aerojet's disclosures "changed the amount Aerojet is seeking in damages yet again . . . but still left all claimed damages other than those in its original Claim Letter of February 2016 ($6.9 million) unquantified and failed to provide a defaulted calculation of damages"); Smith Decl. Ex. 2 at 2. The parties agree Global has not identified specific damages attributable to Aerojet's allegedly wrongful conduct in Global's Rule 26 disclosures, though Global contends the same is true of Aerojet's damages assessments. UMF 48.

D.    Relevant Procedural Background

Aerojet filed its first amended complaint on June 21, 2018. ECF No. 59. Defendant Mitsui answered. ECF No. 62. Global then filed an answer and counterclaims. ECF Nos. 65, 93.[6]

Aerojet now moves for summary judgment on Global's counterclaims. Mot., ECF No. 110-1. While that motion was pending, on October 23, 2018, Aerojet and Global filed a stipulation under which Aerojet would withdraw "any and all claims against Defendants for breach

loss sustained by it or its own employees resulting from an activity carried out under the applicable license.").

[6] As Global explains, it filed one answer on behalf of the Global defendants originally sued and another on behalf of the group of insurers added for the first time in Aerojet's first amended complaint. ECF No. 187 at 4 n.1.

of the duty to defend and for damages consisting of defense costs Aerojet incurred in connection with the claims Orbital asserted against Aerojet." ECF No. 117. The court denied without prejudice the request to dismiss these claims "because withdrawal of individual claims is governed by Fed. R. Civ. P. 15" and "[t]o withdraw individual claims, plaintiff must amend its complaint under Rule 15(a)(2)." ECF No. 123 (citing *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 403 F.3d 683, 687−89 (9th Cir. 2005)). Then, after Global filed an opposition to Aerojet's motion for summary judgment, Opp'n, ECF No. 126, and a counter-motion under Federal Rule of Civil Procedure 56(f), Counter Mot., ECF No. 127-1, the court accepted the parties' stipulation under which Aerojet filed a second amended complaint omitting dismissed defendants and withdrawing all claims against defendants concerning any breach of the duty to defend and defense cost damages Aerojet incurred. ECF No. 148 (stipulation & order); Sec. Am. Compl. ("SAC"), ECF No 149.

With Aerojet's operative second amended complaint filed, Global filed an answer and counterclaim. Counterclaim, ECF No. 154. Aerojet then moved to strike that answer and counterclaim, Mot. to Strike, ECF No. 158-1, opposed Global's Rule 56(d) motion, Counter-Mot. Opp'n, ECF No. 156, and filed a reply in support of its motion for summary judgment, Reply, ECF No. 164. Global filed a reply in support of its Rule 56(d) motion, Counter Mot. Reply, ECF No. 162, and opposed the motion to strike, Strike Opp'n, ECF No. 184. Aerojet then filed a reply in support of its motion to strike, Strike Reply, ECF No. 190. In the midst of these filings, noting potential mootness issues and the apparent lack of meaningful meet and confer efforts with respect to multiple pending motions, the court ordered the parties to meet and confer and file a joint status report. ECF No. 160.

The parties were unable to resolve outstanding issues. *See* ECF No. 165. The court allowed the parties to file supplemental briefs, Def. Supp. Br., ECF No. 187; Pl. Supp. Br., ECF No. 188, and on March 22, 2019, the court heard Aerojet's motion for summary judgment, Global counter-motion and Aerojet's motion to strike. The court submitted the motions after hearing and resolves them here.

/////

/////

II.    LEGAL STANDARD

A court will grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).[7]

The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The burden then shifts to the nonmoving party, which "must establish that there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986).  In carrying their burdens, both parties must "cit[e] to particular parts of materials in the record . . .; or show [] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[the nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts").  Moreover, "the requirement is that there be no genuine issue of material fact . . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247-48 (emphasis in original).

In deciding a motion for summary judgment, the court draws all inferences and views all evidence in the light most favorable to the nonmoving party.  *Matsushita*, 475 U.S. at 587–88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

/////

---

[7] Rule 56 was amended, effective December 1, 2010.  However,  it is appropriate to rely on cases decided before the amendment took effect, as "[t]he standard for granting summary judgment remains unchanged."  Fed. R. Civ. P. 56, Notes of Advisory Comm. on 2010 amendments.

A court may consider evidence as long as it is "admissible at trial." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). "Admissibility at trial" depends not on the evidence's form, but on its content. *Block v. City of L.A.*, 253 F.3d 410, 418-19 (9th Cir. 2001) (citing *Celotex Corp.*, 477 U.S. at 324). The party seeking admission of evidence "bears the burden of proof of admissibility." *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002). If the opposing party objects to the proposed evidence, the party seeking admission must direct the district court to "authenticating documents, deposition testimony bearing on attribution, hearsay exceptions and exemptions, or other evidentiary principles under which the evidence in question could be deemed admissible . . . ." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385–86 (9th Cir. 2010). However, courts are sometimes "much more lenient" with the affidavits and documents of the party opposing summary judgment. *Scharf v. U.S. Atty. Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979).

The Supreme Court has taken care to note that district courts should act "with caution in granting summary judgment," and have authority to "deny summary judgment in a case where there is reason to believe the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 255. A trial may be necessary "if the judge has doubt as to the wisdom of terminating the case before trial." *Gen. Signal Corp. v. MCI Telecommunications Corp.*, 66 F.3d 1500, 1507 (9th Cir. 1995) (quoting *Black v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994)). This may be the case "even in the absence of a factual dispute." *Rheumatology Diagnostics Lab., Inc v. Aetna, Inc.*, No. 12-05847, 2015 WL 3826713, at *4 (N.D. Cal. June 19, 2015) (quoting *Black*, 22 F.3d at 572); *accord Lind v. United Parcel Serv., Inc.*, 254 F.3d 1281, 1285 (11th Cir. 2001).

Under Rule 56(d), when "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). "Where [] a summary judgment motion is filed so early in the litigation, before a party has had any realistic opportunity to pursue discovery relating to its theory of the case, district courts should grant any Rule 56(f) motion fairly freely." *Burlington N. Santa Fe R. Co. v. Assiniboine & Sioux Tribes of Fort Peck*

*Reservation*, 323 F.3d 767, 773–74 (9th Cir. 2003) (citing, *inter alia*, *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001) (noting "the Supreme Court has restated [Rule 56(f)] as requiring, rather than merely permitting, discovery 'where the non-moving party has not had the opportunity to discover information that is essential to its opposition.'")).

III.    DISCUSSION

      A.    Motion to Strike Counterclaims & Mootness

Responding to Aerojet's first amended complaint, Global answered and pleaded counterclaims for (1) breach of the covenant of good faith and fair dealing, (2) breach of the parties' non-waiver agreement, (3) estoppel as to Aerojet's ability to seek damages beyond those sought in its initial claim, and (4) waiver as to contractual and certain property damages.  ECF Nos. 65, 93. Opposing Aerojet's motion for summary judgment as to those counterclaims, Global abandoned its waiver counterclaim and defended its estoppel counterclaim as a promissory estoppel counterclaim. Opp'n at 13 n.4, 21−23.  After filing its opposition, and in response to Aerojet's second amended complaint, Global pleaded counterclaims for (1) breach of the covenant of good faith and fair dealing, (2) breach of the parties' non-waiver agreement and (3) promissory estoppel. Counterclaims.

The parties agree there is no material difference between the counterclaims pleaded in Global's operative responsive pleading and the counterclaims briefed in the pending motion for summary judgment.  *See* Strike Opp'n at 6 (Global arguing its answer "does not contain any new affirmative defenses, new counterclaims, or new factual allegations or insert new liability theories"); Transcript (Tr.), ECF No. 195, at 2:14−3:3 (Aerojet's counsel agreeing with court that motion to strike "is much ado about nothing" as counterclaims in Global's operative answer were fully briefed).

Nonetheless, Aerojet moves to strike the counterclaims because Global argues their most recent answer and counterclaims moot Aerojet's motion for summary judgment.  *See* ECF No. 165 at 4 (parties' joint status report); Def. Supp. Br. at 4, 6; *see also* Tr. at 3:6−22 (Aerojet stating it would withdraw motion to strike if Aerojet conceded mootness and Global declining to do so because "[t]he operative pleading is the answer to the second-amended complaint").

It is a "well-established doctrine that an amended pleading supersedes the original pleading." *Ferdik v. Bonzelet*, 963 F.2d 1258, 1262 (9th Cir. 1992), *as amended* (May 22, 1992) (citation omitted) (earlier complaints could not provide identities of defendants unnamed in later operative complaint). "[A]fter amendment the original pleading no longer performs any function and is 'treated thereafter as non-existent.'" *Id.* (citation omitted). Here, while the parties appear constitutionally unable to agree to much at all, they do effectively agree that Global's amendments are essentially cosmetic. Thus, Global's earlier pleaded counterclaims are "without legal effect" but the "legal effect" of the superseding counterclaims has not changed. *See Lacey v. Maricopa Cty.*, 693 F.3d 896, 927 (9th Cir. 2012). Accordingly, Global's amendment moots the motion for summary judgment only if the court blindly adheres to the notion that an amended pleading supersedes the original while ignoring the practical reality that the amended pleading remains susceptible to arguments made in the pending motion for summary judgment. *See Ferdik*, 963 F.2d at 1262. Doing so "would be to exalt form over substance." *See* Charles A. Wright, et al., 6 Fed. Prac. & Proc. Civ. § 1476 (3d ed.) (addressing whether amended complaint moots motion to dismiss); *see also, e.g.*, *Estate of Peterson v. City of Missoula, Mont.*, No. CV 12-123-M-DLC-JCL, 2013 WL 1026767, at *1 (D. Mont. Feb. 7, 2013), *report and recommendation adopted*, No. CV 12-123-M-DLC-JCL, 2013 WL 1087345 (D. Mont. Mar. 14, 2013) (exercising discretion to consider motion for summary judgment insofar as it "raises issues that have been adequately briefed and pertain equally to the amended complaint") (citing *Shupe v. Cricket Communications Inc.*, 2013 WL 68876 *3 (D. Ariz. 2013)).

Aerojet invites the court, as an alternative resolution of the motion to strike, to "hold the amendments to be immaterial to Global's counterclaims." Mot. to Strike at 15. Mindful that the Federal Rules of Civil Procedure "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding," Fed. R. Civ. P. 1, the court agrees. The court DENIES the motion to strike and finds the operative answer does not moot in full Aerojet's motion for summary judgment, and the court turns to that motion next.

/////

B.    Waiver

In response to Aerojet's motion for summary judgment, and as confirmed by omission in their most recently pleaded counterclaims, Global has abandoned its waiver counterclaim.  *See* Opp'n at 13 n.4 ("The Global Defendants are not opposing that portion of Aerojet's motion pertaining to the counterclaim for waiver.").  Because the waiver counterclaim is no longer live, this portion of Aerojet's motion is DENIED as MOOT.

C.    Promissory Estoppel

"The elements of promissory estoppel are (1) a clear promise, (2) reliance, (3) substantial detriment, and (4) damages 'measured by the extent of the obligation assumed and not performed.'"  *Toscano v. Greene Music*, 124 Cal. App. 4th 685, 692 (2004) (quoting 1 Witkin, Summary 11th Contracts §§ 249, 250 (9th ed. 1987)).

Global contends Aerojet's initial February 17, 2016 letter to Global seeking reimbursement "limited the scope of any potential future expansion of the Aerojet claim by stating: 'documents submitted by Orbital show that it may incur additional costs to repair property damage arising from the two incidents.  Also, there may be additional categories of property damage for which Orbital has not yet provided back-up information (e.g., the destroyed spacecraft and cargo).'"  Counterclaims ¶ 224 (quoting Initial Request; emphasis omitted); Opp'n at 22.  Citing Aerojet's current contention it is entitled to $30.5 million and its "attribut[ing] the bulk of these dramatic increases in its claimed damages . . . to as-yet unquantified types of damages such as 'delay and disruption' and 'reprocurement costs,'" Global claims Aerojet's initial claim and "course of conduct thereafter" induced Global's reliance and caused Global "substantial damages" through its "investigation of Aerojet's ever-changing assertions regarding the nature and scope of its indemnity claim."  Counterclaims ¶¶ 225−28; Opp'n at 22−23; Counter Mot. Reply at 10 ("The Global Defendants' reliance on Aerojet's February 2016 claim and its course of conduct until June 2018 [when Aerojet increased the bases and amounts of damages for which it seeks indemnification] is the basis for their promissory estoppel Counterclaim").

Global has not presented a viable claim for promissory estoppel.  "In general, California law is very protective of the rights of the insured," *Guebara v. Allstate Ins. Co.*, 237 F.3d

14

987, 1000 (9th Cir. 2001) (Fletcher, B., J., dissenting), and because promissory estoppel claims sound in equity, there is perhaps reason to doubt the propriety of insurer's promissory estoppel claim against its insured, *see, e.g.*, *US Ecology, Inc. v. State of California*, 129 Cal. App. 4th 887, 902 (2005) ("Because promissory estoppel is an equitable doctrine to allow enforcement of a promise that would otherwise be unenforceable, courts are given wide discretion in its application."). Global has not identified a single authority addressing a similar promissory estoppel claim brought by an insurer against its insured, essentially seeking to hold the insured to its initial claim as a "promise" to limit the character of future indemnity requests, including in an indemnity suit following denial of the claim. *See* Tr. at 8:1−12. Moreover, insurers often plead estoppel as an affirmative defense, as Global has done here, and Global has not explained why its separate estoppel defense is so inadequate as to justify the court's recognizing an affirmative promissory estoppel claim. *See* Counterclaims ¶¶ 96−100; Tr. at 8:13−24 (Global acknowledging "duplication" without explaining why such duplication is necessary). In any event, even if the court were inclined to find Global might pursue a promissory estoppel claim, it cannot find Global presents a viable claim here as explained below.

Promissory estoppel requires an enforceable promise. "To be binding, thee promise must be clear and unambiguous." *Lange v. TIG Ins. Co.*, 68 Cal. App. 4th 1179, 1185 (1998) (collecting cases). "The doctrine is inapplicable where no clear promise is made." 1 Witkin, Summary 11th Contracts § 245.

Global argues Aerojet's February 17, 2016 letter promised to seek indemnification only for property damages and to increase the amount sought based only on Orbital's supplemental information concerning property repair and destroyed property costs. *See* Opp'n at 22−23. Aerojet counters that it "made no such promise," as its February 17, 2016 letter was expressly "an initial request" unaccompanied by a "promise[], at any time, to limit [Aerojet's] right to seek full coverage under Global's policies." Reply at 4.

Aerojet's February 17, 2016 letter does not contain an unambiguous promise capable of supporting a promissory estoppel claim. Construing the evidence in a light most favorable to Global, Aerojet's letter sought indemnification for property damages alone but did not

clearly promise to cabin all future requests, as Global appears to have acknowledged nearly contemporaneously. *See* Pl. Supp. Br. Ex. 2 at 5 (Global April 7, 2016 market report addressing Aerojet's February 2016 claim: "Aerojet is not making a demand for the entire settlement amount of $50 million. However, Aerojet stated that its demand was an initial demand and that it could be supplemented in the future."); *see also Lange*, 68 Cal. App. 4th at 1186 (defendant's letter stating, "TIG has served notice of termination of its General Agency Agreement on EVE[8] effective July 6, 1996," did not "constitute[] a binding promise EVE would not be terminated under any circumstances before July 6, despite provisions in the agency agreement between TIG and EVE which allowed for immediate termination with cause," as the statement was not "a promise of any sort, let alone a promise of sufficient definitiveness and clarity, to justify applying promissory estoppel."). Moreover, to the extent Global relies on Aerojet's "course of conduct" following its initial request, during which time Aerojet never provided Global with additional information concerning other damages requests or proof of further property damage asserted by Orbital, Global does not explain how Aerojet's conduct could be construed as an unambiguous promise. *See* Opp'n at 23. The court sees no means by which Global could make such an argument if afforded further opportunity to do so.

At hearing when pressed on this point, Global pivoted, arguing Aerojet's "clear and unambiguous promise came in the form of the non-waiver agreement . . . [which] essentially just spells out in very clear terms what's already in the policies, which is basically nobody is going to play fast-and-loose here." Tr. at 9:6−10. Global does not explain why promissory estoppel is necessary to enforce any promise contained in the non-waiver agreement, particularly a promise that is also contained in the controlling policies, as nothing in the record before the court indicates the non-waiver agreement or policies were not supported by consideration. *See* 1 Witkin, Summary 11th Contracts § 244 (2019) ("[T]he [promissory] estoppel is a substitute for consideration."); *Fleet v. Bank of Am. N.A.*, 229 Cal. App. 4th 1403, 1412–13 (2014) ("A cause of action for promissory estoppel is a claim in equity that substitutes reliance on a promise for consideration in the usual

---

[8] "EVE" refers to EVE Insurance Brokerage. *Lange*, 68 Cal. App. at 1182.

sense of something bargained for and given in exchange. If actual consideration was given by the promisee, promissory estoppel does not apply.") (internal quotation marks and citations omitted). Moreover, as discussed below, Global asserts a breach of contract claim arising from Aerojet's obligations under the non-waiver agreement and "a cause of action for promissory estoppel is inconsistent with a cause of action for breach of contract based on the same facts." *Id.* (citations omitted). A party is entitled to plead in the alternative, Fed. R. Civ. P. 8(d)(d), and "[w]hen a pleader is in doubt about what actually occurred or what can be established by the evidence, the modern practice allows that party to plead in the alternative and make inconsistent allegations," *Fleet*, 229 Cal. App. 4th at 1413. But Global has not raised any such doubts as to the validity of the non-waiver agreement or policies here that would require it to resort to promissory estoppel to enforce promises contained therein.

Global's inability to identify an unambiguous promise necessary to support its promissory estoppel claim is fatal. While Global argues it requires additional discovery to properly support its counterclaims, it has not identified any discovery that will somehow render Aerojet's February 17, 2016 letter or its conduct thereafter a clear and unambiguous promise. Accordingly, Global has not identified yet undiscovered "information that is essential to [their] opposition." *See Metabolife Int'l, Inc.*, 264 F.3d at 846 (citing *Anderson*, 477 U.S. at 250 n.5).

The motion for summary judgment as to Global's promissory estoppel claim is GRANTED and the Rule 56(d) motion as to that claim is DENIED.

D. <u>Breach of Contract</u>

Global alleges Aerojet breached the parties' September 1, 2015 non-waiver agreement. Counterclaims ¶¶ 216−21. Under that agreement, as relevant here, the parties agreed:

> 4) That Aerojet . . . will keep Global abreast of its settlement negotiations with Orbital and will not purport to reallocate or recharacterize any item of damages that may become the subject of a settlement agreement and release exchanged with Orbital.

> 5) That Aerojet further agrees to provide Global with additional documentation in connection with the Orbital claim as required by Global to conduct a full investigation of the claim under the Policies.

Non-Waiver Agreement at 2; *see* Counterclaims ¶¶ 216−17 (quoting these provisions). Global

argues that by seeking property damages and attorneys' fees and expenses in its February 17, 2016 initial request and now seeking "reprocurement costs Orbital incurred to mitigate launch schedule delays in connection with the Orb-3 Incident and alleged delay and disruption damages in connection with the E-17 Incident," Aerojet has breached its agreement not to "reallocate[] and recharacterize[] items of damages paid in its settlement with Orbital in breach of the Non-Waiver Agreement." *Id.* ¶¶ 218−20. Global further alleges Aerojet did not "provide any documentation or evidence of loss for these additional categories of damages and . . . costs" and thus breached the agreement to provide Global with additional necessary documentation. *Id.* ¶ 221.

Although presented as a single claim, Global's allegations concern two separate provisions of the non-waiver agreement, the reallocation of damages provision and the documentation provision, and identify discrete means by which Aerojet allegedly breached each provision. Accordingly, the court separately addresses each provision below.

### 1. Reallocation of Damages

Aerojet argues it cannot be found to have reallocated damages because "the Settlement Agreement never characterized or allocated the settlement amount in any way, shape or form" and instead "provided a 'lump sum' payment that resolved all issues covered by the Settlement Agreement." Mot. at 16 (citing UMF 24−25). Thus, "[w]ithout an original allocation or characterization of the settlement amount," Aerojet argues, "there can be no breach of Paragraph 4 [of the non-waiver agreement] as a matter of law." *Id.* at 17.

While Aerojet focuses, perhaps myopically, on the settlement agreement's "lump sum" payment, Global looks to Aerojet and Orbital's settlement negotiations for evidence Aerojet has changed its assessment of damages over time. At least at this juncture, Global introduces sufficient evidence to survive summary judgment, as reviewed below.

Global argues there is evidence Aerojet reallocated damages in its February 17, 2016 letter by recharacterizing $2 million attributable to the E-17 Incident as property damage despite having informed Orbital in 2014 that Aerojet was not liable for any expenses incurred in connection

with the E-17 Incident. Opp'n at 11, 20; *see* Murphy Decl.,[9] ECF No. 126-2, Ex. B at 2 (Aerojet Feb. 17, 2016 initial request[10] to Global seeking reimbursement for "[c]osts for repairs to property resulting from the E-17 Incident per Orbital letter dated December 21, 2015 and attachments: $2,000,000") & 91 (attached Orbital Dec. 21, 2015 letter requesting total of "$2 million in labor and repair costs" as sum of "Orbital [] deductible," "Investigation," and "Amount not covered by insurance (fixed costs Orbital ATK would have incurred regardless of E-17 Failure"); Posner Decl.,[11] ECF No. 126-5, Ex. C at 4, 6 (Aerojet settlement counteroffer to Orbital with proposed "goodwill payments" to Orbital for "E17 test failure recovery costs (Stennis Space Center test stand refurbishment, etc.)"; Posner Decl., Ex. A at 3 (Aerojet's admission it did not notify Global of potential claims arising from E-17 accident until August 2015, which Global argues tends to show Aerojet did not believe accident included covered expenses). Global also argues there is evidence suggesting "Aerojet attempted to enlist Orbital's help in recharacterizing more [settlement] damages," or, at the least, indicating Aerojet's characterization of damages is inconsistent with Aerojet and Orbital's understanding of the settlement. *See* Opp'n at 20 (citing Murphy Decl., Ex. B at 71 (Orbital's Nov. 6, 2015 letter to Aerojet "providing property damage data in support of claims made in Orbital['s] [] draft complaint" and stating, "As you know, the overwhelming majority of Orbital['s] [] damages arose out of non-property damage claims e.g., contract overpayment and increased efforts required by Orbital [] such as the PEP upgrade[12]")).

Aerojet's reply does not squarely address the evidence Global relies on here, other than claiming Global misconstrues the evidence without explaining how. *See* Reply at 6. In its

[9] Exhibits to Murphy's declaration are provided at ECF Nos. 126-3 and 126-4.

[10] While Aerojet provides the initial request alone, Global also provides attachments to that request.

[11] Exhibits to Posner's declaration are provided at ECF Nos. 126-6 to 126-17.

[12] Neither party defines "PEP upgrade." In a section of Orbital's 2014 draft complaint titled "AJ26 Engines Fail to Provide Contractually Mandated Thrust," Orbital stated, "[t]o compensate for the lower thrust provided by the Engines and to ensure that the Antares would satisfy NASA's payload requirements, Orbital was forced to make significant adjustments to the overall resupply system and to undertake a Performance Enhancement Program ('PEP')." Wong Decl., Ex. 1 at 8−9. Oribtal repeated this allegation in its 2015 draft complaint. Wong Decl., Ex. 2 at 22−23.

supplemental brief, Aerojet argues Orbital's November 6, 2015 letter to Aerojet does not evidence Aerojet's attempted collusion, but instead indicates "Orbital's view, without knowing what Aerojet's insurance policy benefits were." Pl. Supp. Br. at 5. Aerojet also cites the testimony of Global's Rule 30(b)(6) witness, stating he did not believe fraud or collusion were at play. *Id.* (citing Pl. Supp. Br. Ex. 1 at 349:19−350:4). At best, Aerojet demonstrates a dispute as to the evidence that cannot be resolved on summary judgment.

Aerojet also argues the non-waiver agreement "was intended solely to permit Global[13] to settle the Orbital claim and preserve the parties' respective rights under the policies" and thus cannot serve as the basis for Global's claim. Reply at 6. This conclusory argument is unaccompanied by any attempt to interpret the language of the non-waiver agreement and does not allow the court to conclusively construe that language in Aerojet's favor here. Notably, at hearing while addressing a separate issue, Aerojet's counsel explained that despite serving as an insurance attorney "on a day-to-day basis for the last 25 years," he had never seen "allocation and characterization language" like that contained in the non-waiver agreement, though a "waiver of a consent to settle" is a common occurrence. Tr. at 12:5−12. Under these unique facts, and at this juncture, the court cannot find this claim fails, at least as to the reallocation provision.

Aerojet next argues Global cannot show damages for Aerojet's alleged breach of the non-waiver agreement. Mot. at 18. "An element of a breach of contract cause of action is damages proximately caused by the defendant's breach. The statutory measure of damages for breach of contract is 'the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom.'" *Copenbarger v. Morris Cerullo World Evangelism, Inc.*, 29 Cal. App. 5th 1, 9 (2018) (quoted in Judicial Council of California Civil Jury Instruction ("CACI") Instruction 350; quoting Cal. Civ. Code § 3300) (internal citation omitted).

Global contends it has "sustain[ed] real and substantial damages in the form of increased costs of investigating Aerojet's recurring recharacterizations of the damages for which it

---

[13] Aerojet likely intended to identify Aerojet rather than Global here, and the court assumes as much.

seeks indemnity." Opp'n at 21 (citations omitted). In support, Global cites the sworn declaration of their Vice President of Claims, Anthony J. Murphy, who states he initially understood Aerojet's February 17, 2016 claim letter to "present[] a claim for what it perceived to be property damage," but "[u]pon reviewing the Claim Letter and attachments [he] noted that the damages relating to the E-17 Incident . . . were not property damages but were described as such by Aerojet." Murphy Decl. ¶¶ 4−5. He further states that Aerojet has since "changed its position several times regarding the nature of the damages for which it purports to seek indemnity," requiring "Global to expend considerable resources to investigate, analyze and respond to Aerojet's claim . . . . not limited solely to outside legal counsel fees, but [also] includ[ing] internal resources at Global and expenses." *Id.* ¶ 6; *see also* Tr. at 23:12−16 (Global arguing "investigation costs are not nothing"; explaining Global is not seeking "litigation costs and costs of outside counsel . . . we are limiting the damages to those investigation costs."). Because contract damages are intended to put the party in the position it would have enjoyed absent breach, the court does not find these damages are insufficient, at least at this juncture.

As to the reallocation provision of this claim, the motion for summary judgment is DENIED.

## 2.   Documentation

Aerojet argues Global cannot identify any documentation Global sought but did not receive from Aerojet prior to denying Aerojet's claim and therefore cannot now claim Aerojet breached the non-waiver agreement's documentation requirement. Mot. at 17; *see* Non-Waiver Agreement at 2 (requiring Aerojet "to provide Global with additional documentation in connection with the Orbital claim as required by Global to conduct a full investigation of the claim under the Policies"); Counterclaims ¶ 221 (alleging Aerojet breached non-waiver agreement by "fail[ing], completely, to provide any documentation or evidence of loss for [] additional categories of damages and for the costs of the loss of the spacecraft and payload identified as additional property damage in [Aerojet's] Initial Disclosures"). Global did not respond to this argument in its opposition. At hearing, Global suggested Aerojet's argument "is a red herring" because while Global received all documents necessary to investigate and deny Aerojet's initial February 2016

claim, "[a]t this point in time, there is an entirely different kind of claim that's being made for other types of damages that were not the subject of any investigation prior to this litigation."  Tr. at 33:7−17; *see also* Def. Supp. Br. at 6 ("To date, Aerojet has not provided the Global Defendants with any documentation that substantiates its drastic change in position on damages, when it went from allocating $6.9 million of the settlement to allegedly covered claims to allocating $30.5 million of the settlement to allegedly covered claims.").

In short, Global contends Aerojet has not complied with the non-waiver agreement's documentation requirement because Aerojet has not properly supported its request for damages in this litigation.  *See* Pl. Supp. Br., Ex. 2 at 5 (Global Market Report confirming Global received documents necessary to issue a coverage opinion).  If Aerojet is not able to properly support its claim for damages in this case, ultimately it will not prevail.  The court finds no basis, however, for concluding Aerojet's failure to prove its claims at this juncture in this court constitutes breach of the non-waiver agreement, particularly because that agreement required Aerojet to provide Global with "additional documentation . . . required . . . to conduct a full investigation of the claim under the Policies."  Non-Waiver Agreement at 2.  Global admits Aerojet provided documentation requested in connection with the claim, and Global denied that claim.  Nothing in the non-waiver agreement required Aerojet to provide information in a suit challenging Global's denial of the claim, even if its assessment of its damages changed.

No further discovery will affect this ruling, and thus, as to the documentation portion of the non-waiver agreement, Aerojet's motion for summary judgment is GRANTED and Global's Rule 56(d) request is DENIED.

E.       Breach of the Implied Covenant of Good Faith and Fair Dealing

Under California law, every contract includes an implied promise of good faith and fair dealing that precludes "each party [from] . . . unfairly interfer[ing] with the right of any other party to receive the benefits of the contract . . . ."  CACI Instruction 325.  A claim for breach of the implied covenant requires the plaintiff to prove each element necessary to sustain a claim for breach of contract, "except that instead of showing that defendant breached a contractual duty, the plaintiff must show, in essence, that defendant deprived the plaintiff of a benefit conferred by the contract

22

in violation of the parties' expectations at the time of contracting." *Levy v. JP Morgan Chase*, No. 10CV1493 DMS (BLM), 2010 WL 4641033, at *3 (S.D. Cal. Nov. 5, 2010) (internal quotation marks and citation omitted).

In the insurance context, while "the 'duty of good faith and fair dealing . . . is a two-way street, running from the insured to his insurer as well as vice versa[,]'" *Kransco v. Am. Empire Surplus Lines Ins. Co.*, 23 Cal. 4th 390, 402 (2000), *as modified* (July 26, 2000) (quoting *Commercial Union Assurance Companies v. Safeway Stores, Inc.*, 26 Cal. 3d 912, 918 (1980)), "what that duty embraces is dependent upon the nature of the bargain struck between the insurer and the insured and the legitimate expectations of the parties which arise from the contract," *Commercial Union Assurance Companies*, 26 Cal. 3d at 918; *see, e.g.*, *Kransco*, 23 Cal. 4th at 402 (insured's breach of implied covenant may be pursued as contract claim only while insured may raise insurer's breach as tort); *White v. Western Title Ins. Co.*, 40 Cal. 3d 870, 885–88 (1985) (because insurer-insured relationship continues after commencement of litigation, insurer's litigation conduct, including unreasonably low settlement offer, may be used to establish insurer's course of conduct amounts to breach of implied covenant).

Here, citing Aerojet's notice to Global of its ongoing settlement discussions with Orbital only as the settlement deadline was rapidly approaching and only after Aerojet had already decided to settle, as well as Aerojet's providing Global with Orbital's 2014 draft complaint for the first time in discovery in this case, Global contends Aerojet "breached its duty of cooperation and put [Global] in an untenable position, thereby breaching the implied covenant of good faith and fair dealing in the Policies." Counterclaims ¶¶ 203–09. At hearing, Global clarified that no part of its claim is based on Aerojet's "untimely notice," which Global instead cites to show "back in 2014 Aerojet didn't think it had coverage for most of the claims asserted against it by Orbital" but changed its position when the 2015 negotiations commenced, placing Global in a position where "entering into the non-waiver agreement was the only thing to do." Tr. at 21:6−17; Opp'n at 18. Global also cites Aerojet's initial claim to Global for $9,654,490.24 in property damages and legal expenses, Aerojet's purported knowledge that the limitation of liability provision in its contract with Orbital relieved Aerojet of liability for Orbital's consequential damages, and Aerojet's failure

23

to notify Global "prior to commencing [this] litigation . . . it was seeking indemnity for anything other than alleged property damage and legal expenses," contending Aerojet's commencement of this suit ultimately "seeking in excess of $30.5 million in compensatory damages" constitutes a breach of the implied covenant of good faith and fair dealing.  Counterclaims ¶¶ 210−12; Opp'n at 18.

Essentially, then, Global argues Aerojet breached its duty of good faith and fair dealing by initially failing to submit any claim or notice of the Orbital dispute, then submitting a claim seeking only certain relief, and ultimately suing Global for indemnification for damages that, in Global's estimation, are not covered under the policy and that Aerojet knows are not covered under the policy.  *See* Counterclaims ¶ 213 ("Plaintiff's attempt to obtain indemnity for damages other than property damage constitutes a breach of the implied covenant of good faith and fair dealing in the Policies . . . ."); *see also* Opp'n at 16 ("Aerojet has gone to great lengths to recharacterize breach of contract damages and other aspects of its indemnity claim in an effort to obtain coverage for damages that are not covered under the Policies.").

### 1.   Denial of Benefit Under the Contract

Aerojet contends Global must, but cannot, identify denial of a benefit under the contract.  Mot. at 19.  The court addresses Aerojet's various arguments on this point below.

#### a.   Payment of Premiums

Aerojet first argues that defendants' sole benefit under the contract is receipt of Aerojet's policy premiums, and because Aerojet paid those premiums, "[d]efendants' implied covenant counterclaim necessarily fails . . . ."  *Id.* at 19−20.  Under this theory, Global could not premise its claim on Aerojet's alleged "fail[ure] to comply with the Policies' cooperation clause" or attempts to seek recovery other than property damages "because neither constitutes a benefit [d]efendants received under the Policies" but instead "set[s] conditions Aerojet must meet to perfect its right to coverage under the Policies . . . ."  Mot. at 20.  The authorities Aerojet relies on here merely confirm an insured is obligated to pay premiums, which affect the scope of an insured's obligations under the implied covenant.  *See* Mot. at 20 (citing, *inter alia*, *Kransco*, 23 Cal. 4th at 404).  None of Aerojet's authorities suggests an insured's only duty to the insurer is to pay

24

premiums, that an insured satisfies its obligation of good faith and fair dealing by paying its premiums, or that a cooperation clause does not work to the benefit of the insurer. *See* Tr. at 19:6−16 (Aerojet explaining it likely could not find any authority for this position because "it's a self-evident proposition"). The court does not find the proposition Aerojet advances "self-evident," and its argument is not persuasive.

b.  The Policy's Cooperation Clause and the Parties' Non-Waiver Agreement

Aerojet next contends Global cannot premise its breach of the implied covenant counterclaim on the policy's cooperation clause because Global "expressly waived the cooperation clause in the Non-Waiver Agreement." Mot. at 21. Under that agreement, Global "waive[d] any objection it may otherwise have had pursuant to Policy Condition[] . . . 5(c)(3) to any settlement Aerojet may enter into with Orbital in connection with the Orbital claim prior to the commencement of litigation only, without waiving any other rights, including the right to disclaim coverage." Non-Waiver Agreement at 1−2. Under § 5(c)(3), "[Aerojet's] Executive Director, Risk Management or his or her designee and any other involved insured must: . . . Cooperate with us in the investigation, settlement or defense of the claim or *suit* . . . ." 2014 Policy, § IV(5)(c)(3) (original emphasis).

Global responds that, in entering into the non-waiver agreement, it waived "[o]nly the specific portion of the cooperation provision of the Policy that deals with the right to enter into a settlement" with "[a]ll remaining Policy conditions remain[ing] intact." Opp'n at 17. Reading the policy language in light of the non-waiver agreement, § 5(c)(3) is susceptible to Global's interpretation. Aerojet's cursory briefing on this issue and failure to address Global's argument on reply, *see* Reply at 7−9, do not rebut that interpretation. On this record, the court cannot find as a matter of law Global waived the cooperation clause as it applies to this claim.

c.  The Policy's Cooperation Clause and Global's Denial of Coverage

Aerojet next argues "any obligation Aerojet had under [the policy's cooperation clause] ended once Defendants' [sic] denied coverage." Mot. at 21 (citing *Ass'n of Apartment Owners of Imperial Plaza v. Fireman's Fund Ins. Co.,* 939 F. Supp. 2d 1059, 1065 (D. Haw. 2013) (applying Hawaii law and "conclud[ing] that Defendant's denial of coverage constituted a breach

25

that relieved Plaintiff of the contractual duty to cooperate in this case"); 4 Law of Liability Insurance § 32.02 (Matthew Bender, Rev. ed. 2019) ("An insurer that denies coverage, reserves its rights, breaches it obligations to the insured first, or anticipatorily breaches, cannot assert failure to cooperate as a defense to coverage.")).  Global argues Aerojet's only authority for this position involved either a prior determination the insurer had breached the policy by wrongfully denying the insured's claim, thus releasing the insurer of its obligation to comply with the cooperation clause, or the insurer relied on the insured's breach of the cooperation clause as a basis for denying coverage.  *See* Opp'n at 17.  Global argues neither authority controls because whether Global breached the policy by denying Aerojet's claim remains to be decided and Global is not asserting Aerojet's breach as a defense to coverage. *See id.* at 17–18.

Both parties appear to misrepresent what the case *Association of Apartment Owners* stands for.  There, in resolving the cooperation clause issue, the court did not find the insurer breached the policy because its denial of the insured's claim was wrongful on the merits, as Global suggests, though the court ultimately concluded the insurer owed the insured indemnity under the policy.  *See* Opp'n at 17; *Apartment Owners*, 939 F. Supp. 2d at 1075.  But the court also did not clearly conclude that an insured's obligations under the cooperation clause will always and automatically terminate upon denial of coverage, as Aerojet argues.  Mot. at 21.  Rather, the court found, under the circumstances of that case, the denial of coverage relieved the insured of the contractual duty to cooperate  because the insurer's denial "confronted [the insured] with the difficult position of quickly remediating [the insured property] to prevent further damage or waiting for [the insurer] to decide whether or not to conduct a further investigation."  *See* 939 F. Supp. 2d at 1066.  Noting "[t]he rationale behind relieving an insured from the cooperation provision after a denial of coverage is that the denial exposes the insured to the financial insecurity that the insured attempted to avoid by purchasing the policy," and finding that "rationale . . . particularly applicable here," the court found the insurer's "[d]enial made [the insured] assume the risk of financial insecurity, [and thus the insured] was free to take action without the constraints of the cooperation clause in the Policy." *Id.* at 1065–66.  The same concerns were present in the single California case the *Apartment Owners* court cited, *Samson v. Transamerica Insurance Company*, which held,

"if an insurer denies coverage to the insured, the insured's contractual obligation to notify the insurer [of a suit] ceases," but also expressly found the insurer had wrongfully refused to defend the insured in an ongoing lawsuit against him, thus violating the policy and placing its insured in the difficult position of providing his own defense without the benefit of his policy's protections. 30 Cal. 3d 220, 236, 238, 240 (1981).

Accordingly, while there is general support for the proposition that an insured's duty to cooperate is extinguished by the insurer's denial of a claim, as Aerojet argues *Apartment Owners* establishes, that rule appears to apply most clearly where the insured must still take action without the benefit of its policy's protections and should not be hampered by that policy's cooperation provision. Aerojet has not shown that rule applies to all such denials and, more importantly, has not shown it applies here. Rather, nothing in the record before the court indicates that Global's denial placed Aerojet in the "difficult position" of deciding whether to take necessary action or forego such action to wait for its insurer's further investigation, as Aerojet submitted its claim only after it settled its dispute with Orbital. *See Ass'n of Apartment Owners,* 939 F. Supp. 2d at 1065; *see also Samson*, 30 Cal. 3d at 240.

The court is skeptical of Global's position that because this litigation has not yet resulted in a determination that Global wrongfully denied coverage, "Aerojet remains bound by its contractual duty of cooperation"; this position suggests Aerojet remains bound by the duty to cooperate as it decides what relief to seek in this case and thus may breach the implied covenant by seeking what Global considers to be excessive damages. *See* Opp'n at 17. Generally, "[t]he obligation of good faith and fair dealing extends to the assertion, settlement and litigation of contract claims and defenses." Rest. (Second) of Contracts § 205 (1981). But it is hardly clear that an insured remains bound by a policy's cooperation clause and thus risks breaching the duty of good faith and fair dealing as it decides how to legally challenge its insurer's denial of its claim. *Cf. Shibata v. Lim*, 133 F. Supp. 2d 1311, 1321 (M.D. Fla. 2000) (lender's claim alleging borrowers breached implied covenant of good faith and fair dealing by falsely asserting defense characterizing loan as investment constituted too "broad [an] extension of the good faith covenant"); *id.* at 1321 n.4 (noting "a party can resort to a properly-briefed Rule 11 motion when presented with litigation

27

claims or defenses that are unsubstantiated by fact"). Global's argument may ask too much of the policy's cooperation clause and the implied covenant, and arguably much more than public policy will allow.

Nonetheless, Aerojet raised this issue only indirectly, mostly at hearing, and without citation to authority. *See* Mot. at 14 (arguing without elaboration that Global's "counterclaims seek to hold Aerojet liable for its litigation conduct in seeking all damages to which it believes it is entitled"); Tr. at 25:19−25 (citing chilling effect on insureds that recognizing such a claim would cause); *id.* at 35:9−17, 36:6−13 (arguing insured cannot be liable for only gaining full understanding if its insurance coverage upon hiring litigation counsel). By failing to properly raise this point in its briefing, Aerojet deprived Global of an opportunity to respond; the court declines to make arguments on Aerojet's behalf or deprive Global an opportunity for a rebuttal, while recognizing further motion practice may revisit this point in the future.

### 2. Prejudice and Damages

Aerojet also argues Global must "establish[] prejudice from any alleged breach of [the cooperation provision]" because "[p]rejudice is a predicate to a cooperation defense under California law." Mot. at 22 (citing *Campbell v. Allstate Ins. Co.*, 60 Cal. 2d 303, 305 (1963) ("An insurer may assert defenses based upon a breach by the insured of a condition of the policy such as a cooperation clause, but the breach cannot be a valid defense unless the insurer was substantially prejudiced thereby."); *Billington v. Interinsurance Exch. of S. Cal.*, 71 Cal. 2d 728, 737 (1969) ("[A]n insurer, in order to establish it was prejudiced by the failure of the insured to cooperate in his defense, must establish at the very least that if the cooperation clause had not been breached there was a substantial likelihood the trier of fact would have found in the insured's favor."). Global responds that it is not relying on the cooperation clause, or any other policy condition, as a defense to coverage, meaning the authority on which Aerojet relies is inapplicable here. Opp'n at 18; *see, e.g.*, CACI Instructions 2320 (insurer's affirmative defense to breach of contract for insured's failure to provide timely notice, requiring prejudice as element), 2321 (insurer's affirmative defense to breach of contract for insured's breach of duty to cooperate in defense, requiring prejudice as element). Aerojet responds, "[t]he law is [] clear that an insurer must establish prejudice to rely on

the cooperation clause in any way to limit or deny coverage," but again cites only authority showing prejudice is necessary to support a defense to coverage arising from the cooperation clause. *See* Reply at 9. Aerojet's position has some substance, as Global seeks to bring an affirmative claim for its insured's purported frustration of the policy's purpose without showing any resulting prejudice, though Global arguably could not raise the same misconduct as a defense to coverage without showing prejudice. Nonetheless, a claim for breach of the implied covenant need not rely on "a specific provision of the contract," *Schwartz v. State Farm & Casualty Co.*, 88 Cal. App. 4th 1329, 1339 (2001), and Aerojet has not provided the court with a reason to rule in its favor here.

Finally, Aerojet argues Global cannot establish damages. Mot. at 22 ("Defendants received their benefit of the insurance contracts in full – payment of the premiums."). Global relies on its investigation costs, as it does in its breach of the non-waiver agreement claim. Opp'n at 18−19. Global's authority supporting its investigation costs as damages theory involved a fraud claim brought by an insurer against its insured, not a breach of the implied covenant claim. *See* Opp'n at 17−18 (citing *Agric. Ins. Co*, 70 Cal. App. 4th at 402–03) ("When a legally required, and hence justified, investigation is conducted into a factually false claim, and the insurer consequently incurs expenses that would otherwise have been unnecessary, the insurer is damaged."); *see also id.* (requiring insurer to plead "the claim was false in a factual sense, and not merely in the sense of the insured's inflated opinion of value . . . ."). While Aerojet argued in its reply brief that Global was required to investigate its claim and therefore cannot rely on investigation costs as damages, Reply at 6, Global argued Aerojet bears the burden of "bring[ing] a claim within the scope of coverage under a policy" and damaged Global by seeking "indemnity for damages that are not covered under the policies," Tr. at 36:23−37:6. Here, on this record, the court is not prepared to find Global's investigation costs cannot serve as damages.

The motion for summary judgment as to Global's breach of contract and breach of the implied covenant of good faith and fair dealing claims is DENIED.

IV.  <u>CONCLUSION</u>

Aerojet's motion to strike is DENIED. The motion for summary judgment is DENIED as moot as to the waiver claim; GRANTED as to the promissory estoppel claim, with

Global's Rule 56(d) request DENIED; DENIED as to the reallocation provision of the breach of the non-waiver agreement claim; GRANTED as to the documentation portion of the breach of the non-waiver agreement claim, with Global's Rule 56(d) request DENIED; and DENIED as to the breach of contract and breach of the implied covenant of good faith and fair dealing claim.

This order resolves ECF Nos. 110, 127 and 158.

IT IS SO ORDERED.

DATED:  September 23, 2019.

_____
UNITED STATES DISTRICT JUDGE